In the Matter of the Claim of EVELYN THOMPSON FOSTER, Respondent, against AMERICAN RADIATOR COMPANY and Another, Appellants.

STATE INDUSTRIAL BOARD, Respondent.

Third Department, January 20, 1937.

*Dudley, Stowe & Sawyer* [*Horace C. Winch* of counsel], for the appellants.

*John J. Bennett, Jr., Attorney-General* [*Roy Wiedersum, Assistant Attorney-General,* of counsel], for the respondent State Industrial Board.

McNAMEE, J.   Thomas F. Thompson died in the course of his employment, August 1, 1928, leaving a wife and three dependent children.   Awards of death benefits were made by the Industrial Board on May 7, 1929, of thirty per cent of the average wages of the deceased to the widow, and of ten per cent to each of the children, and these awards were paid.   On May 14, 1931, the widow married Harry Foster, and thereupon a new award was made to her of two years' compensation in a lump sum, amounting to $993.15, and increasing to fifteen per cent the provision for each of the children.

On November 30, 1935, the marriage of the widow was annulled " *ab initio,*" and thereupon, on her application, another award was made reinstating the widow's rights to death benefits, *from May 14, 1931,* less the lump sum payment.   In that award the provision for each child was reduced to ten per cent.

The Industrial Board made the last award upon the theory that the second marriage never existed, and was a nullity in all its aspects, with no legal significance.   There is nothing in the record to indicate the ground of annulment, and, therefore, whether the second marriage was void or voidable; therefore, it must be presumed to be only voidable, and not void.   To hold otherwise would be equivalent to a presumption that Foster was guilty of crime. (Domestic Relations Law, §§ 5 and 6; Penal Law, § 340.)

At the time payments to the widow were stopped, they ceased upon her application, and upon her abandonment of her status of widowhood. She induced the action of the Board, with advantage to herself and her children, and in the exercise of the election given to her by the Workmen's Compensation Law (§ 16, subd. 2). While the benefits which that law provides are not called " support," they are that, and intended to be such. And if this award were to stand, the widow would be entitled to support from two sources during the period of about four years while the second marriage continued; and during that same period the payments to the children were increased. Such was never the intention of the statute. On the contrary, it provides for payments only " during widowhood (or dependent widowhood)."

In its decision the Industrial Board directed that the award to the widow " is hereby reinstated with a resumption of payments from *May 14, 1933*," thus giving the employer and carrier credit for the lump sum payment covering two years, but holding them liable for payments to the same extent as though the marriage to Foster had never occurred. The Board proceeded on the theory that the annulment erased the fact of the second marriage and all its consequences. This we regard as unsound.

When property was conveyed to a woman in consideration of marriage, which was annulled later, the wife was not required to return the property. The Court of Appeals said that " The decree of annulment destroyed the marriage from the beginning as a source of rights and duties, * * * but it could not obliterate the past and make events unreal." (*American Surety Co.* v. *Conner*, 251 N. Y. 1, 9.) In another case, a wife under a separation agreement was entitled to receive alimony, " to continue so long as she remains unmarried." A divorce followed, and then a second marriage, which was annulled. The wife sued to recover from the first husband alimony for the period of the second marriage. The Court of Appeals again said that " annulment when decreed, puts an end to it [the marriage] from the beginning. * * * It is effaced as if it had never been. *From then on*, payments to either spouse may be demanded and must be made on the footing of its nullity." And further, that " The retroactive effect of rescission from the beginning is not, however, without limits, prescribed by policy and justice. * * * The defendant, the first husband, must *now* comply with the mandate of the judgment of divorce and provide for his former wife as for one who has not remarried. This does not mean, as we view it, that he must provide for her during the years when the voidable remarriage was in force and unavoided." And again, " ' The doctrine of relation is a fiction of law adopted by the courts solely

for the purposes of justice.' * * * It becomes an instrument of injustice when used to change the quality of intervening acts or omissions by strangers to the controversy." And again, " To say that the judgment of annulment has put the defendant in default through the fiction of relation is to say that the plaintiff shall have support or an equivalent from each of two men during the same period of time, and this by force of a fiction subservient to justice. Analogies of legal doctrine all point the other way." Again the court said: " The purpose of an award of alimony is support for a divorced wife not otherwise supported. This purpose is perverted by imputing a dual obligation. * * * The wife might have waited to annul the marriage to her second husband till the first was in his grave. If that had been her choice, we cannot bring ourselves to believe that she could have recovered from his estate the installments accruing during life on the theory that by the fiction of relation he had been in default from the beginning." (*Sleicher* v. *Sleicher*, 251 N. Y. 366, 369, 370, 371.) No authority has been pointed out, and none has been found, that indicates a married woman enjoying the advantages of a voidable marriage, may recover support, or its equivalent, from another source, as though, or on the theory, that she was *not* married. In all the cases that have come to our attention, the principle of justice has been maintained, and she has not been allowed to use the voidable marriage as an instrument of injustice. The award here is clearly unjust; is out of harmony with the decisions; and is a violation of the letter and spirit of the statute.

There is still another aspect of this case to which reference must be made. The interlocutory decree of annulment was entered August 31, 1935; and by its terms, as well as by force of the statute (Civ. Prac. Act, §§ 1175, 1176), it became a final decree on November 30, 1935. The interlocutory decree did not annul the marriage; that result was accomplished when the final judgment was entered. These sections apply alike to decrees of divorce, and of annulment. The Court of Appeals has said, in a divorce action: " We suppose that there will be no dispute concerning the proposition that the interlocutory judgment could not and did not even purport to dissolve the marriage relation between the parties to the action, but contemplated and provided for a final judgment which should accomplish that result." (*Matter of Crandall*, 196 N. Y. 127, 130.) There are numerous authorities that justify the holding that a marriage is not dissolved nor annulled by the interlocutory judgment, but only by the entry of the final judgment. (*Pettit* v. *Pettit*, 105 App. Div. 312; *Bryon* v. *Bryon*, 134 id. 320; *Burton* v. *Burton*, 150 id. 790; *Leeds* v. *Joyce*, 202 id. 696; affd., 235 N. Y. 620.)

Accordingly, the widow was not entitled to be reinstated in her right to benefits prior to November 30, 1935, the time when the final decree of annulment became operative.

The decision and award reinstating the widow in her right to death benefits should be modified to provide that payments shall be resumed as of November 30, 1935, instead of August 31, 1935, and as so modified affirmed, with costs against the State Industrial Board.

HILL, P. J., RHODES, CRAPSER and BLISS, JJ., concur.

Decision and award modified by fixing the date of reinstatement as of November 30, 1935, and as so modified affirmed, with costs against the State Industrial Board.